UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, IDAHO RIVERS UNITED, and GOLDEN EAGLE AUDUBON SOCIETY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE,<br><br>Defendant,<br><br>MOSQUITO MINING CORPORATION,<br><br>Intervenor/Defendant. | Case No. 1:11-CV-00341-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court in the above-entitled matter are the Cross-Motions for

Summary Judgment filed by the parties in this environmental case and related motions.

The matters have been fully briefed and are ripe for the Court's consideration. Having

fully reviewed the record, the Court finds that the facts and legal arguments are

adequately presented in the briefs and record. Accordingly, in the interest of avoiding

further delay, and because the Court conclusively finds that the decisional process would

not be significantly aided by oral argument, the Motions shall be decided on the record

before this Court without a hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 27, 2011, Plaintiffs, Idaho Conservation League, Idaho Rivers United, and

Golden Eagle Audubon Society, filed the Complaint in this matter challenging the United

States Forest Service's ("Forest Service") actions and decisions made in relation to its

February 2011 Decision Notice ("DN"), Finding of No Significant Impact ("FONSI"),

and Environmental Assessment ("EA").[1] (Dkt. 2.) These actions and decisions resulted in

the approval of the CuMo Exploration Project ("CuMo Project" or "Project"), a mining

exploration Project, on the Grimes Creek in the Boise River watershed within the Boise

National Forest in Idaho. Mosquito Mining Corporation is the private mining exploration

company seeking to undertake the CuMo Project for the purpose of conducting

preliminary exploratory drilling activities in order to determine whether there is sufficient

mineralization and adequate geological characteristics present in the area to support a

mine for copper and molybdenum. (Dkt. 12.) The Project was submitted pursuant to the

1872 Mining Law as amended under which the Forest Service has authority to regulate

but may not deny a project provided the activities proposed are reasonably incident to

mining, not needlessly destructive, and otherwise comply with applicable state and

---

[1] Plaintiffs are each non-profit corporations located principally in Boise, Idaho who have members, supporters, and staff who work, live, study, and recreate throughout Idaho who will be impacted by the CuMo Project. (Dkt. 2.)

federal law. (CU046241, CU045815-16) (citing 16 U.S.C. § 478, 551, 30 U.S.C. § 612.) Given its role in the CuMo Project, Mosquito Mining filed a Motion to Intervene which this Court granted. (Dkt. 7, 11.)

The Plaintiffs bring this case under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, claiming the Forest Service's decisions and actions violate the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* and National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.* and implementing regulations of these statutes. (Dkt. 2.) The Forest Service maintains its decisions and actions were in accord and fully complied with the applicable standards and requirements of these statutes. (Dkt. 17.) Likewise, Mosquito Mining argues the Forest Service properly complied with NEPA and NFMA. (Dkt. 12.)

All of the parties have filed Motions for Summary Judgment. (Dkt. 23, 27, 29, 30.) In addition, the Forest Service has filed a Motion to Strike Plaintiffs' Declarations, which Mosquito Mining has joined. (Dkt. 24, 25.) Mosquito Mining has filed a Motion to Amend/Correct the Administrative Record as well as its own Motion to Strike. (Dkt. 26, 48.) The Court will take up these Motions in this Order as follows.[2]

## DISCUSSION

### 1.     Motions Concerning the Record

---

[2] Various corrections, duplications, and combined briefing have been filed as to the pending Motions which has been cumbersome to review, but all of which the Court has now considered in ruling on these Motions. Although the Court has reviewed each of the submissions of the parties, in this Order the Court may not cite to all of the duplicated filings or amended filings as in some instances the only changes were corrections to the citation form as to page numbers.

**MEMORANDUM DECISION AND ORDER -**   3

The parties have filed Motions to Strike and a Motion to Correct relating to the materials the respective parties believe are appropriate for the Court's consideration in this matter. These Motions are all subject to the same conditions for judicial review under the ADA which requires that the review of the agency decision be based upon the evidence before the agency at the time the decision in question was made. *See Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) ("Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court."). There are a limited number of exceptions to the allowance of materials not contained in the administrative record: "(1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record it is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith." *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (*quoting Southwest Ctr.*, 100 F.3d at 1450). The Court will apply these rules of APA review in addressing each Motion below.

### A.    Motion to Strike Letter

Attached to Plaintiffs' Combined Response/Reply to the Cross-Motions for Summary Judgment is a letter sent by the Plaintiffs to Cecilia R. Seesholtz, Forest Supervisor, dated February 14, 2012. (Dkt. 45 and 46, Ex. A.) The letter is titled "Request

**MEMORANDUM DECISION AND ORDER -**   4

for Supplemental NEPA for the CuMo Exploration Project, Boise National Forest, Idaho

City Ranger District, Boise County, Idaho" and purports to convey new information

regarding the impacts to the Sacajawea's bitterroot in the Project area. (Dkt. 45 and 46,

Ex. A.) Because the letter was not in existence until after the EA and DN/FONSI were

completed, Mosquito Mining has filed a Motion to Strike arguing the letter should not be

allowed as it is not properly a part of the administrative record that was before the Forest

Service at the time it made its ruling. (Dkt. 48.) The Court agrees. Because the February

14, 2012 letter was not before the Forest Service at the time it made its decision, and no

exception to the APA's review rules applies, it is not properly a part of the administrative

record. The Motion to Strike is granted.

### B.    Motion to Strike Declarations

The Forest Service has filed a Motion to Strike certain of Plaintiffs' Declarations

filed in support of its Motion for Summary Judgment. (Dkt. 24.)[3] In particular, the

Declarations, or portions of the Declarations, of Leon Powers, Kathryn Didricksen, John

Robison, Pam Conley, Ann Finley, and Liz Paul. (Dkt. 24.) These materials, the Forest

Service argues, are extra-record opinions concerning the subject matter of this case to the

extent they contain the declarants' own opinions and suppositions concerning the

decision.[4] Plaintiffs counter that the Declarations are appropriate for the Court's

---

[3] Mosquito Mining has joined in this Motion. (Dkt. 25.)

[4] The Forest Service does not oppose the Declarations to the extent they are relevant to establish standing.

consideration as they are expert declarations showing that the Forest Service failed to

consider important environmental impacts which Plaintiffs claim is a "NEPA exception"

to the general rule regarding the Administrative Record. (Dkt. 40.) The Forest Service

maintains the opinions expressed in the Declarations should have been placed before it

prior to the EA and DN/FONSI being issued and, because they were not, they should not

now be allowed to be presented to the Court as the Forest Service did not have the

opportunity to review/address the opinions in the Declarations before making its

decisions.

The Plaintiffs cite cases to support their argument of an "NEPA exception." (Dkt.

40.) In one such case, *National Audubon Soc. v. United States Forest Serv.*, the Ninth

Circuit recognized that "certain circumstances may justify expanding review beyond the

record" where, for example, "an allegation that an EIS has failed to mention a serious

environmental consequence may be sufficient to permit the introduction of new evidence

outside of the administrative record...." 46 F.3d 1437, 1447 (9th Cir. 1993) (quoting

*Animal Def. Council v. Hodel*, 867 F.2d 1244 (9th Cir. 1989)). There the Ninth Circuit

stated:

> the district court may extend its review beyond the administrative record
> and permit the introduction of new evidence in NEPA cases where the
> plaintiff alleges "that an EIS has neglected to mention a serious
> environmental consequence, failed adequately to discuss some reasonable
> alternative, or otherwise swept stubborn problems or serious criticism under
> the rug."

*Id.* (quoting *County of Suffolk v. Sec. of the Interior*, 562 F.2d at 1384-85 (citations

omitted)). Thus, the Court may "look beyond the record insofar as it is intended to show that [the agency's] research or analysis was inadequate." *Headwaters, Inc. v. BLM Medford Dist.*, 665 F. Supp. 873, 876 (D.Or. 1987). In other words, evidence outside the record may be admissible if such evidence is "necessary to determine whether the agency has considered all relevant factors and has explained its decision...." *Southwest Ctr.*, 100 F.3d at 1450.

　　As to the Declarations of Powers and Robison, the Court finds these do not fall within any exception to the APA rule as they do not raise matters the Forest Service failed to analyze nor are they necessary for the Court to use in order to determine whether the agency has considered all relevant factors and has explained its decision. The Motion to Strike is granted as to those Declarations. As to the Declarations of Finley, Conley, Paul, and the remainder of Robison's Declaration, these relate to the Plaintiffs standing and, to that end, are not challenged by the Motion to Strike. However, as to the Declaration of Kathryn Didricksen, the Court finds this material to be necessary to determine whether the Forest Service considered all relevant factors and explained its decision in regards to the Project's impact on groundwater.

　　During the public commenting period, Plaintiffs raised their concern that the Project's drilling could alter groundwater hydrology resulting in increased flows from adjacent areas previously contaminated with historic mining waste. (CU046319.) The Forest Service responded stating "[n]o baseline groundwater studies were conducted because there are no expected impacts to groundwater...." (CU050755.) The Forest

**MEMORANDUM DECISION AND ORDER -**　7

Service's position being that baseline studies were unnecessary because the type of closed drilling that would be used in the Project only has a nominal potential to affect groundwater. (CU046319.) Plaintiffs take issue with this response, pointing to Ms. Didricksen's Declaration in support of their contention that the Forest Service's response failed to properly consider this concern and explain its decision. Because the matters raised in the Didricksen Declaration are "necessary to determine whether the agency has considered all relevant factors and has explained its decision," the Court will deny the Motion to Strike as to that particular Declaration. *Southwest Ctr.*, 100 F.3d at 1450.

### C.   Motion to Correct

In support of its Motion for Summary Judgment as to the NFMA Claim and Motion to Dismiss, Mosquito Mining has filed a Motion to Correct Omission from Administrative Record to add an "Approval Letter" and attachments which the Forest Service apparently sent to Mosquito Mining on August 30, 2011 approving its Plan of Operations ("PoO"). (Dkt. 26.) These materials were created after the EA and DN/FONSI were issued in February of 2011. They show, Mosquito Mining argues, the process by which it must follow in order to obtain approval to move forward in the Project where construction in any RCA is contemplated. The Forest Service disagrees with the Motion and maintains the record is complete as filed as it includes the evidence before the agency at the time the decision was made. (Dkt. 39.) Likewise, the Plaintiffs oppose the Motion as it seeks to improperly include post-decision documents into the record. (Dkt. 41.)

The Court has reviewed the parties arguments and denies the Motion to Correct.

**MEMORANDUM DECISION AND ORDER -**   8

This action challenges the Forest Service's February 2011 EA and DN/FONSI for the

CuMo Project. The materials sought to be admitted by Mosquito Mining were not in

existence until August 30, 2011. No exception to the general rule for administrative

record review under the APA applies here. As such, the materials are not properly before

the Court in this APA review case and the Motion is denied.

**2.      Motions for Summary Judgment**

  **A.      NEPA Standard of Review**

   Because NEPA does not contain a separate provision for judicial review, we

review an agency's compliance with NEPA under the APA, 5 U.S.C. § 706(2)(A). *Ka*

*Makani O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 958 (9th Cir. 2002) (citing

*Churchill Cnty. v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001)). Judicial review of

administrative agency decisions under the APA is based on the administrative record

compiled by the agency—not on independent fact-finding by the district court. *Camp v.*

*Pitts*, 411 U.S. 138, 142 (1973). Courts may resolve APA challenges via summary

judgment. *See Nw. Motorcycle Ass'n v. United States Dep't Agric.*, 18 F.3d 1468, 1472

(9th Cir. 1994). Summary judgment is appropriate where "there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed.

R. Civ. P. 56(a).

   Claims alleging a violation of NEPA are governed by two standards of review. *See*

*Price Rd. Neighborhood Ass'n, Inc. v. United States Dept. of Transp.*, 113 F.3d 1505,

1508 (9th Cir. 1997) (finding that two standards govern the review of agency actions

involving NEPA); *Alaska Wilderness Rec. & Tour. v. Morrison*, 67 F.3d 723 (9th

Cir.1995). Factual or technical disputes, which implicate substantial agency expertise, are

reviewed under the "arbitrary and capricious" standard. *Id.* (citing *Marsh v. Oregon*

*Natural Res. Council*, 490 U.S. 360, 376-77 (1989)). Legal disputes, however, are

reviewed under the less deferential "reasonableness" standard. *Id.* (citing *Alaska*

*Wilderness*, 67 F.3d at 727).

In general, courts must grant substantial deference to the decisions and actions of

federal agency defendants in adopting and implementing certain agency activities. *Kettle*

*Range Conservation Grp. v. United States Forest Serv.*, 148 F.Supp.2d 1107 (E.D. Wash.

2001). NEPA "does not mandate particular results, but simply describes the necessary

process" that an agency must follow in issuing an EIS. *Id.* (citing *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 349 (1989)). Accordingly, when an agency

reaches a decision based on its expert review of the facts, a reviewing court should

determine only whether the decision was "arbitrary or capricious." *Id.* (citing *Marsh*, 490

U.S. at 378). In other words, "the reviewing court 'must consider whether the decision

was based on a consideration of the relevant factors and whether there has been a clear

error in judgment.'" *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

U.S. 402, 416 (1971)). The "reasonableness" standard, on the other had, is an exception to

the generally applicable rule stated in *Marsh*, *supra*. This "reasonable" standard of review

applies only to those "rare" cases in which the agency's decision raises legal, not factual,

questions. *Id.* (citing *Alaska Wilderness*, 67 F.3d at 727). Both standards may be applied

**MEMORANDUM DECISION AND ORDER -**   10

in the same case to different issues. These standards reflect the axiomatic distinction

between "the strong level of deference we accord an agency in deciding factual or

technical matters [and] that to be accorded in disputes involving predominantly legal

questions." *Id.*

The issues presented in this case involve factual and/or technical matters and,

therefore, the arbitrary and capricious standard applies to all issues. In reviewing an

agency action under this standard, the Court must determine whether the action is

"arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the

law." 5 U.S.C. § 706(2)(A). "Normally, an agency rule would be arbitrary and capricious

if the agency has relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise."

*MotorVehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The scope of review under the "arbitrary and capricious" standard is narrow and a court is

not to substitute its judgment for that of the agency. *Id.* Nevertheless, the agency must

examine the relevant data and articulate a satisfactory explanation for its action including

a "rational connection between the facts found and the choice made." *Id.* (citing

*Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). In reviewing that

explanation, the court must "consider whether the decision was based on a consideration

of the relevant factors and whether there has been a clear error of judgment." *Id.* (citing

**MEMORANDUM DECISION AND ORDER -**   11

*Bowman Transp. Inc. v. Arkansas-Best Freight Syst.*, 419 U.S. 281, 285 (1975); *Citizens*

*to Preserve Overton Park*, 401 U.S. at 416).

###### B.    NEPA Claims

Plaintiffs allege the Forest Service violated NEPA in approving the CuMo Project

by failing to conduct the necessary analysis regarding sensitive species in the area and

groundwater. Specifically, Plaintiffs challenge that the Forest Service's finding of no

significant impact and decision not to prepare an EIS. The Forest Service and Mosquito

Mining both maintain the EA and DN/FONSI complied with NEPA.

NEPA requires preparation of an EIS for all "major Federal actions significantly

affecting the quality of the human environment." 42 U.S.C. 4332(C); *see also Ocean*

*Advocates v. United States Army Corps of Eng'r*, 402 F.3d 846, 864-65 (9th Cir. 2005). In

determining whether an EIS must issue, the Ninth Circuit has stated:

> Whether an action may significantly affect the environment requires
> consideration of context and intensity. Context delimits the scope of the
> agency's action, including the interests affected. Intensity refers to the
> severity of impact, which includes both beneficial and adverse impacts, the
> degree to which the proposed action affects public health or safety, the
> degree to which the effects on the quality of the human environment are
> likely to be highly controversial, the degree to which the possible effects on
> the human environment are highly uncertain or involve unique or unknown
> risks, and whether the action is related to other actions with individually
> insignificant but cumulatively significant impacts.

*Center for Bio. Diversity v. National Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1185–86

(9th Cir. 2008) (internal quotations and citations omitted); *See also Native Ecosystems*

*Council v. United States Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) ("In

benchmarking whether the [] Project may have a significant effect on the environment,

we turn to the NEPA regulations that define "significantly." 40 C.F.R. § 1508.27 (2000).

Whether a Project is significant depends on both the Project's context and its intensity.").

The regulations define "significantly" in NEPA as calling for an analysis of both

"context" and "intensity." 40 C.F.R. § 1508.27.[5] "Context" is "society as a whole (human,

national), the affected region, the affected interests, and the locality." 40 C.F.R. §

1508.27(a). Intensity "refers to the severity of impact" and is evaluated or measured by

certain factors including, as relevant here, "[u]nique characteristics of the geographic area

---

[5] "Significantly" as used in NEPA requires considerations of both context and intensity:
(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short and long-term effects are relevant.
(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity: (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial. (2) The degree to which the proposed action affects public health or safety. (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas. (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial. (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks. (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration. (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts. (8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources. (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973. (10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.
40 C.F.R. § 1508.27.

**MEMORANDUM DECISION AND ORDER -**   13

such as proximity to historic or cultural resources, park lands...." 40 C.F.R. § 1508.27(b)(3).

Generally, an agency must prepare an EIS if the environmental effects of a proposed agency action are highly uncertain. *See Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) ("significant environmental impact" mandating preparation of an EIS where "effects are 'highly uncertain or involve unique or unknown risks'"); 40 C.F.R. § 1508.27(b)(5). Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, *see id.* at 1213-14 (lack of supporting data and cursory treatment of environmental effects in EA does not support refusal to produce EIS), or where the collection of such data may prevent "speculation on potential. .. effects. The purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action." *Sierra Club*, 843 F.2d at 1195.

In reviewing an agency's decision not to prepare an environmental impact statement, the question is "whether the agency took a 'hard look' at the potential environmental impact of a Project." *Blue Mts.*, 161 F.3d at 1212. Courts use the arbitrary and capricious standard when reviewing an agency's decision to not complete an EIS. *Id.* at 1211. Under that standard, the court must determine whether the agency has taken the requisite "hard look" at the environmental consequences of the proposed actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons explaining why the Project's impacts are insignificant. *See Metcalf v.*

**MEMORANDUM DECISION AND ORDER -** 14

*Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000), *Blue Mts.*, 161 F.3d at 1211. "A full [EIS] is not required if the agency concludes after a good hard look that the proposed action will not have a significant environmental impact." *Tillamook Cnty. v. United States Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002).

Where, as here, the agency concludes there is no significant effect associated with the proposed Project, it may issue a FONSI in lieu of preparing an EIS. *Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); 40 C.F.R. 1508.9(a)(1). However, an agency "cannot avoid preparing an EIS by making conclusory assertions that an activity will have only an insignificant impact on the environment." *Ocean Advocates*, 402 F.3d at 864. The agency "must supply a convincing statement of reasons to explain why a Project's impacts are insignificant." *Blue Mts.*, 161 F.3d at 1212 (internal quotations omitted).

If the reasons for a finding of no significant impact are arbitrary and capricious and the complete administrative record demonstrates that the Project may have significant impact on the environment, ordering the preparation of an EIS is appropriate. *Center for Bio. Diversity*, 538 F.3d at 1179. An agency may first prepare an Environmental Assessment ("EA") to decide whether the environmental impact is significant enough to warrant preparation of an EIS. An EA is a "concise public document ... [that] [b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. 1508.9. An EA is arbitrary and capricious if it fails to consider an important aspect of the

problem, or "offer[s] an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. United States Envtl. Prot. Agency*, 346 F.3d 955, 961 (9th Cir. 2003).

Here, the Forest Service issued an EA and DN/FONSI concluding no EIS was necessary because the CuMo Project will not significantly impact the environment. (CU045795, 046228.) Plaintiffs challenge this finding arguing an EIS was required because the Project may have significant impacts on the environment; stated differently, that the DN/FONSI was in error and the Forest Service failed to satisfy NEPA's requirements in reaching its finding of insignificance. In particular, Plaintiffs assert the DN/FONSI failed to consider the CuMo Project's impacts on sensitive species and the area groundwater.

On February 11, 2011, the Forest Service issued the DN/FONSI in which the Forest Supervisor discussed her reasons for deciding to implement Alternative B for the CuMo Project. (CU046228-246.) The decision allows Mosquito Mining to conduct a five year mineral exploration Project in the area where by it will be allowed to construct 10.2 miles of new temporary roads, utilize 4.7 miles of existing unauthorized roads for purposes of developing up to 137 drill pads. (CU046231.) Alternative B allows Mosquito Mining to drill up to 259 holes from those drill pads ranging in length from 1,500 to 3,000 feet. (CU045824, 046233.) The synthetic non-toxic, biodegradable polymer drill fluid will be re-circulated in a closed system within mud pits which will be covered,

compacted, and recontoured upon completion. (CU046233.) The operating season will

run between April 15 and December 15 with drilling to be conducted on a 24-hour

schedule. (CU046231.) Upon completion, all holes will be filled and sealed. The selected

alternative specifies conditions for the number of drill rigs at a given time, the type of

drill machines and water pumps to be used, the construction of any structures or sheds,

on-site storage of drill consumables, spill prevention measures, and measures to be taken

following the completion of the Project in terms of the holes, drill pads, mud pits, and

roads. (CU046233.)

  Plaintiffs challenge the Forest Service's conclusions arguing the CuMo Project has

significant impacts in that it failed to take a hard look at potential impacts on 1) sensitive

species – wolverine, great gray owl, northern goshawk – and Sacajawea's bitterroot and

2) water resources. In particular Plaintiffs find error in the Forest Service's failure to

conduct baseline surveys of the sensitive species in the area prior to approving the

Project; contesting the "approve first, study later" approach as a violation of NEPA. (Dkt.

23 at 10.) As to the water resources, Plaintiffs argue the Forest Service's decision is

arbitrary and capricious in that it did not consider the impact of the proposed drilling on

the groundwater; particularly given the historic mining which has already contaminated

soils in the area.

  The Forest Service maintains it did not need to prepare an EIS, the EA was not

arbitrary and capricious, and it did take a hard look at the impacts of the decision on

sensitive species and ground water resources. (Dkt. 28.) Similarly, Mosquito Mining

**MEMORANDUM DECISION AND ORDER -**   17

argues the Forest Service satisfied its obligations under NEPA. (Dkt. 31.) The Court will

discuss each of Plaintiffs' arguments in turn.

      1.     **Sensitive Species**

          a.     **Great Gray Owl**

Plaintiffs argue the impacts on the great gray owl are "highly uncertain" and the

Forest Service failed to survey for the species and their nests in the area prior to

approving the CuMo Project. (Dkt. 23 at 7.) Instead, Plaintiffs argue the Project will

"extensively fragment the area's forest habitat," "pose a formidable fragmentation threat

to the Great Gray Owl habitat" especially during the post-fledging period, disturb the

hunting habitat, and may increase human-caused mortality; all of which, Plaintiffs

contend, the Forest Service has failed to address and consider before approving the CuMo

Project. (Dkt. 23 at 8.) Much of Plaintiffs' arguments are based on the failure of the

Forest Service to obtain baseline studies of the species prior to approving the Project;

challenging that the Forest Service's reliance on post-approval monitoring and mitigation

fail to provide the "hard look" required by NEPA before a Project can be approved. (Dkt.

23 at 14.) Additionally, Plaintiffs argue the Forest Service failed to analyze the direct and

indirect disturbance impacts on the species. (Dkt. 23 at 14-15.)

The Forest Service counters that it did consider the impacts on the great gray owl

as raised by Plaintiffs. (Dkt. 28 at 8.) In support of the Forest Service's position,

Mosquito Mining points to a report entitled Wildlife Specialist Report and Biological

Evaluation for Threatened, Endangered, and Sensitive Terrestrial and Avian Species for

**MEMORANDUM DECISION AND ORDER -**  18

the CuMo Project ("WSR/BE"). (Dkt. 31 at 3-4.) The WSR/BE, Mosquito Mining argues,

evidences the Forest Service's hard look and analysis for the sensitive species in and

around the Project area as required by NEPA. As further evidence of NEPA compliance,

Mosquito Mining also notes that the EA is tiered to the Final Environmental Impact

Statement for the Southwest Idaho Ecogroup Land and Resource Management Plan

("Ecogroup FEIS"). (Dkt. 31 at 5) (citing CU000783.) The EA, Ecogroup FEIS, and

WSR/BE, Mosquito Mining argues, extensively discussed the sensitive species at issue in

this case. (Dkt. 31 at 6-14.)

It is true that the EA in this case is tiered to the Ecogroup FEIS and other materials

as stated by Mosquito Mining. (CU045812.) "Tiering is the process of incorporating by

reference coverage of general matters in broader environmental impact statements ... into

subsequent narrower environmental analysis, such as site-specific statements." *Northern

Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1088 (9th Cir. 2011)

(citing 40 C.F.R. § 1508.28). "Tiering under NEPA is permitted in two circumstances: (1)

a program, plan, or policy impact statement may be tiered to a program, plan, or policy

statement or analysis of lesser scope or to a site-specific statement or analysis, and (2) an

environmental impact statement on a specific action at an early stage may be tiered to a

supplement ... or a subsequent statement or analysis at a later stage." *Id.* (quoting §

1508.28(a), (b)) (internal quotations omitted). "Only documents that have undergone

NEPA analysis may be tiered." *Id.* (citing *Kern*, 284 F.3d at 1073).

The usefulness of tiering, however, is limited in its ability to cure a projects own

**MEMORANDUM DECISION AND ORDER -**   19

deficient analysis. Tiering to an EIS that contained only general statements about the cumulative effects of a Project on the area but gave no information specific to the issues raised in the Project at issue does not cure any shortcomings in the EA to which it is tiered. *See Klammath-Siskiyou*, at 977 (tiering to an EIS was insufficient to cure an EA's shortcomings where the EIS contained only general statements about the cumulative effects of logging in the area but mentioned no information specific to the timber sales at issue). The Ninth Circuit has "never held that the analysis of similar effects for a separate Project excuses the failure to consider significant environmental impacts in an EIS. Though "tiering" to a previous EIS is sometimes permissible, the previous document must actually discuss the impacts of the Project at issue." *South Fork Band Council of Western Shoshone of NV. v. United States Dept. of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) (citing *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999) (holding that reliance on the EIS accompanying an earlier planning document was improper because it did not discuss the subsequent specific Project in detail). "The mere existence of an entirely separate draft EIS, discussing a similar issue with regard to a different Project, but without any indication that it discussed the specific environmental impacts at issue, cannot satisfy NEPA." *Id.* Thus, the documents to which the EA in question is tiered must actually supplement the EA's own analysis and address the particular impacts of the Project in question in order to satisfy NEPA.

    The EA's tiering to the Ecogroup FEIS in this case does not address the particular

**MEMORANDUM DECISION AND ORDER -**   20

impacts of the CuMo Project at issue here.[6] The Ecogroup FEIS was compiled to address

the Forest Service's revision of the Land and Resource Management Plans for the

Sawtooth, Payette, and Boise National Forests; and area composed of an estimated

6,600,000 acres of National Forest System lands. (CU000812.) The CuMu Project area,

by comparison, comprises an area totaling 2,885 acres. (CU00045807.) The Purpose of

the Ecogroup FEIS was to provide revised Forest Plans for the Boise, Payette, and

Sawtooth Forests that will: "(1) guide all natural resource management activities on the

Forests, (2) address changed conditions and direction that have occurred since the original

plans were released, and (3) meet the objectives of federal laws regulations and policies."

(CU000815.) The primary basis for the Ecogroup FEIS was to update/revise the three

Forests' Plans to comply with changes in NFMA's implementing regulations and law as

well as address changed conditions in the forests. (CU000816.) The purpose of the CuMo

Project at issue here is to explore the extent of mineral resources present in the limited

project area. Simply put, the Ecogroup FEIS is massive in scope and size compared to the

CuMo Project, covering an enormous swath of forested lands in southwestern Idaho.

Further, the Ecogroup FEIS is larger and broader in terms of scope, area, analysis, and

discussion than the CuMo Project presently before this Court.

Furthermore, in reviewing the citations made to the Ecogroup FEIS in the EA at

---

[6] Although this discussion concerning tiering is contained in the section of this Order's consideration of the great gray owl, the Court's conclusion regarding the tiering of the Ecogroup FEIS is true as to each of the particular issues raised by the Plaintiffs in this case. The Ecogroup FEIS does not discuss the particular issues raised in this case.

issue in this case, the Court finds the particular portions of the EA relying upon the

Ecogroup FEIS are not those that are at issue in this case. The instances of citations to the

Ecogroup FEIS are not in relation to the sensitive species or Sacajawea's bitterroot, or

groundwater. (CU045795.)[7] In fact, most of the references to the Ecogroup FEIS are in

relation to NFMA and/or background or overview material of the area in question. These

references are wholly appropriate for the EA and useful in those capacities but they do

not resolve any alleged shortcomings in the EA as to the particular sensitive species,

Sacajawea's bitterroot, or groundwater concerns raised in this case.

As to the Plaintiffs' concerns regarding the great gray owl in particular, the EA

notes the species was not observed during the 2007 field visits and IDCDC data indicates

there are no known occurrences at or near the Project area. (CU045899.) Regardless, the

EA recognizes that source habitat is present in the area and it is possible that the species

could inhabit the Project area. (CU045920.) Thus, the EA analyzed the direct and indirect

effects of the Project on the great gray owl are discussed in the EA; specifically the

impacts to nesting. (CU045920.) The Forest Service discussed the monitoring that would

occur during the Project activities by way of surveys for the presence of the great gray

owl to determine whether they are present and locate any nesting activity. (CU045832.)

The EA goes on to note the mitigation efforts to be used to reduce the potential impacts to

---

[7] There are some citations in the EA to the Ecogroup FEIS in reference to the particular topics of concern raised by Plaintiffs but they provide only a broad background overview of information concerning the particular species and/or plant. They do not, give information specific to the issues raised in this case.

the nesting of the species by surveying the area and, if a nest is found, implementing

protective measures. In addition, the EA discusses that the majority of the Project area

would remain suitable as potential nesting habitat for great gray owls and any temporary

disturbance would be limited and at the completion of the Project would return by way of

reclamation and revegetation. (CU045921.) The Forest Service also considered

cumulative effects of past and present activities in the area on the great gray owl

including logging, grazing, recreational use, and mineral exploration. (CU045921-23.)

Ultimately, the EA concludes that the Project "may impact individual owls, but are not

likely to contribute to a trend towards federal listing or cause a loss of viability to the

population or species...." (CU045923.)

      The Court finds this discussion and consideration taken by the Forest Service to be

consistent with the "hard look" required by NEPA. *See Metcalf*, 214 F.3d at 1141. This is

not a case where, as Plaintiffs argue, the Forest Service has approved the Project without

any studies or analysis and relies only on post-approval studies. (Dkt. 23 at 10-11);

*compare LaFlamme v. FERC*, 852 F.2d 389, 400 (9th Cir. 1988) and *LaFlamme v. FERC*,

945 F.2d 1124, 1128-29 (9th Cir. 1991). The EA has given appropriate consideration to

the great gray owl and taken the requisite "hard look" at the impacts the CuMo Project

may have on the species in making its determination that no significant adverse impact

would be had to the species and, therefore, no EIS is needed. Accordingly, the Court finds

the Forest Services has satisfied its obligations under NEPA in this respect.

      **b.**    **Northern Goshawk**

**MEMORANDUM DECISION AND ORDER -**  23

As with the great gray owl, Plaintiffs challenge the Forest Service's "approve first, study later" approach as violating NEPA. (Dkt. 23 at 10.)  By approving the Project before conducting surveys of the northern goshawk in the Project area, Plaintiffs assert the Forest Service failed to take the requisite hard look at the potential impacts on this sensitive species. The Forest Service responds that the EA did consider the Project impact on this species. (Dkt. 28 at 8.) The Court finds the EA has satisfied the requirements of NEPA demanding that the Forest Service take a hard look in determining whether or not a project will have significant adverse environmental consequences.

One male northern goshawk was seen within a mile of the Project area in 2009 and 45 percent of the Project area is considered source habitat for the species. (CU045899.) The direct and indirect effects on the northern goshawk are discussed in the EA. (CU045926.) Such effects include noise and construction on nesting activities during incubation periods and human presence and road density in active nesting areas; noting this species prefers to nest the farthest from human disturbance. In the EA, the Forest Service also describes the monitoring that would occur during the Project activities by way of surveys for the presence of the northern goshawk to determine whether they are present and locate any nesting activity. (CU045832.) The mitigation measures employed include surveys to determine the presence of the species and nesting activity during the period of proposed action and, if a nest is found, implementation of the protective measures and modification or relocation of road and drilling locations where feasible. (CU045926.) The adverse impacts would likely be temporary and may, in the long run,

create forest clearings for future potential nesting habitat. The EA goes on to discuss species' mortality as well as alternate nest sites and the possibility of re-nesting. As with the great gray owl, the EA also considered the cumulative effects of past and present logging, grazing, recreational use, and mineral exploration on the northern goshawk. (CU045927-28.)

Based on the above discussed impacts and circumstances, the EA concludes that the Project "may impact individual northern goshawk, but are not likely to contribute to a trend towards federal listing or cause a loss of viability to the population or species...." (CU045928.) As the Court determined above as to the great gray owl, so too here the Court finds the EA's consideration, analysis, and reasoning regarding the CuMo Project's impacts on the northern goshawk is appropriate. *See Metcalf*, 214 F.3d at 1141. The Forest Service's decision here was not made without the benefit of any studies or analysis and relying only on post-approval studies. *Compare LaFlamme v. FERC*, 852 F.2d 389, 400 (9th Cir. 1988) and *LaFlamme v. FERC*, 945 F.2d 1124, 1128-29 (9th Cir. 1991). Just the opposite, the Forest Service has appropriately studied and analyzed the Project's impacts on this species. The Forest Service's conclusion finding no significant impact on the species is not arbitrary or capricious as it is based on the hard look given to appropriate study and data concerning the northern goshawk.

### c.     Wolverine

Plaintiffs argue the Forest Service has failed to properly account for the Project's impacts on the wolverine as to: 1) the overlapping of the wolverine's critical denning

**MEMORANDUM DECISION AND ORDER -   25**

period and the Project's active exploration time frame and 2) cumulative disturbance

impacts by the Project activities on the species. The Forest Service maintains it

considered impacts on the wolverine. (Dkt. 28 at 8) (CU041984, 0451915, 046008,

045900, 042000, 023095, 023092, 045929-30.) Mosquito Mining further notes that no

wolverine is known to occupy the Project area and, regardless, the EA properly analyzed

the existence of potential suitable wolverine habitat and the direct, indirect, and

cumulative effects the Project may have on the species; again pointing to the WSR/BE

and Ecogroup FEIS. (Dkt. 31 at 6-8.)

   The Court finds the Forest Service's conclusions regarding the wolverine satisfy

the requirements of NEPA as they are not arbitrary and capricious. Given the limited

occurrences of wolverine in the area, the level of review conducted by the Forest Service

is sufficient. There is a known currency of a wolverine approximately five miles northeast

of the Project area and there is a report of another wolverine having been poached near

the Project area. (CU045900.) The EA acknowledges that 91 percent of the Project area

contains persistent snow cover into May and therefore could provide source habitat for

wolverine and concludes wolverine may use the Project area. However, given the current

road and drilling activities in the area, the EA also reasons that it is less likely that

wolverines are present given their tendency to avoid human interaction and the

availability of suitable habitat adjacent to the Project area. (CU045930.)

   The Court finds the level of consideration and conclusions reached in the EA and

DN/FONSI were appropriate for the wolverine given their limited numbers in the Project

area. Some have been spotted in the area and the area contains suitable habitat but it does

not appear wolverines reside or habitat in the Project area in numbers necessitating an

analysis beyond that provided in the EA. The EA's discussion of the species as well as

the supporting documentation provides a well reasoned conclusion and basis for that

conclusion. Further, the Court finds the Forest Service did take a "hard look" at the direct

and indirect effects on the wolverine in the EA. (CU045929.) Therein the Forest Service

concludes mortality is unlikely given the mobility of adult wolverines and the low

population densities make for a low likelihood of direct impacts on the species' dens. The

EA thus concludes the Project alternative "may impact individual wolverines but are not

likely to contribute to a trend towards federal listing or cause a loss of viability to the

population or species...." (CU045930.) The Court finds this conclusion is well reasoned

and explained and not arbitrary and capricious. *See Metcalf*, 214 F.3d at 1141.

### d.  Sacajawea's Bitterroot

Sacajawea' bitterroot is a rare plant found only in limited parts of Idaho. Plaintiffs

contend "the Forest Service has failed to conduct comprehensive population mapping and

counts to determine baselines at the site prior to approving" the CuMo Project. (Dkt. 23 at

8.) Again, Plaintiffs find fault in the Forest Service's approach of undertaking post-

approval monitoring without first obtaining the extent of the species in the Project area.

The Forest Service maintains it has considered the Project impact on this species (Dkt. 28

at 8) (CU045879-81, 045883-84, 045891-91.) In response, Mosquito Mining cites to the

Biological Evaluation and Botanical Specialist Report Covering Listed, Proposed,

**MEMORANDUM DECISION AND ORDER -**  27

Candidate, Sensitive, Priority Watch, and Forest Watch Plant Species ("BSR/BE") which

underlies the EA's analysis of this species. (Dkt. 31 at 14.)

The EA notes that Sacajawea's bitterroot is the only rare plant species that has

been observed within the activity area which is considered a "forest watch species."

(CU045873, 045879.) The EA discussed the potential direct impacts to the species;

including road construction, site clearing, drilling, mud pit construction, use of water, and

traffic from equipment, vehicles, and personnel. (CU045879.) Indirect impacts my result

from the use of water creating an environment too wet for the species to survive or

compete. (CU045879.) Additional impacts to the species is also discussed such as road

reclamations, soil movement and disturbances, snowplowing. The EA notes that "the vast

majority of the proposed roads would not be located near known populations and would

pass through areas lacking potential habitat" with the highest likely impact being seen

near existing unauthorized roads and proposed roads to the west. (CU045879.)

The effects of these potential impacts are also discussed as well as the mitigation

measures and monitoring that will be undertaken to reduce the potential impacts on the

species. (CU045880.) The EA states mitigation efforts would include development of a

means of avoidance and reduction of impacts to the greatest extent practicable for

Sacajawea's bitterroot. (CU045833, 0457880.) Where the species is located near roads

and/or drill pads, a reclamation process would be used to minimize impacts to the species

such as relocating proposed drill pads, designated parking and travel corridors for

equipment, vehicles and foot traffic, and adjusting the time period in which an area is

worked to avoid the main period of growth and reproduction of the plant. The EA notes

the Forest Plan objective 0832 for the area includes long-term viability of the species.

(CU045833 at n. 9.) Ongoing monitoring would also be employed to assess population

changes and impacts of the Project. (CU045834, Appendix C.) The Court finds this

consideration and explanation of the Project's impacts on Sacajawea's bitterroot to be in

accord with what is required by NEPA in that the Forest Service's decisions were not

arbitrary and capricious. The impacts to Sacajawea's bitterroot have been analyzed and

monitoring and mitigation efforts employed to minimize those impacts. *See Metcalf*, 214

F.3d at 1141. Given the exact location of the drill pads is not yet known, the Court finds

this discussion to be proper and in accord with the demands of NEPA.

### 2.   Groundwater

The CuMo Project anticipates the drilling of 259 exploratory bore holes ranging

from 1,500 to 3,000 feet deep. Plaintiffs argue the Forest Service erroneously found the

CuMo Project would have no impacts on groundwater hydrology. (Dkt. 23 at 15-16.) The

proposed drilling, Plaintiffs argue, can impact groundwater hydrology which is of

concern given the area has a history of mining which has produced waste and

contaminated soils adjacent to the Project area.

The Forest Service counters that it considered any effects to water quality from the

groundwater that enters Grimes Creek downstream before approving the CuMo Project as

well as baseline water quality data. (Dkt. 28 at 9.) The Forest Service notes it addressed

the concern that the drill holes may intercept groundwater and redirect flows to deeper

levels by requiring that all drill holes be filled and sealed to stabilize down hole

conditions after drilling is completed and applying Idaho mining best management

practices ("BMPS"). (Dkt. 28 at 9.) In addition, the Forest Service notes that the drilling

fluids to be used are non-toxic and biodegradable so there will be no negative effects

from the drilling fluids and the Forest Service Minerals Administrator will monitor the

Project to ensure compliance. Mosquito Mining likewise asserts the EA properly analyzed

and considered the environmental impact of the drilling in finding no significant impact.

(Dkt. 31 at 16-18.)

The Court finds the Forest Service's analysis and conclusion that the CuMo

Project's impacts on the area groundwater to have no significant impact is arbitrary and

capricious. The EA does not undertake a proper analysis of the environmental

consequences in regards to the impact the Project's anticipated exploratory drilling will

have on the groundwater in the area. Instead, the Forest Service relies on the notion that

because the Project will use "closed drilling" methods that there will be no impact on

groundwater. NEPA requires more. *Ocean Advocates*, 402 F.3d at 864 (An agency

"cannot avoid preparing an EIS by making conclusory assertions that an activity will have

only an insignificant impact on the environment."). The fact that closed drilling methods

will be used may address the concerns relating to contamination of the ground water but

does not address the issue regarding the impact the drilling itself will have on the

hydrology of the groundwater. Boring down to 3,000 feet over 200 times into the

subsurface of the area undoubtedly warrants some analysis and consideration of the

**MEMORANDUM DECISION AND ORDER -**   30

impact of the drilling itself; irrespective of the concerns solved by using closed drilling.

The Forest Service failed to adequately consider this important aspect of the Project and

its impact on the environment and/or articulate a satisfactory explanation for its decision.

*See Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43; *Sierra Club*, 346 F.3d at 961 (An EA is

arbitrary and capricious if it fails to consider an important aspect of the problem, or

"offer[s] an explanation that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise."); *Blue Mts.*, 161 F.3d at 1212.

In reviewing the DN/FONSI, EA, and supporting materials, the Court finds the

Forest Service acted arbitrarily and capriciously in concluding that groundwater would

not be impacted.

Environmental consequences of the proposed Project activities to surface waters and the

impact of past and present mining activities in the area are discussed in the EA.

(CU045862-8.) As to past and present mining activities, the EA states they have "not

resulted in exceedance of any water quality beneficial use." (CU045868.) In this

discussion, the EA points to Appendix G which tabulates the cumulative effects of past,

present, and reasonably foreseeable future activities in the area to identify potential

impacts to the resources that may not otherwise be defined. (CU046016-21.) The

conclusion reached in Appendix G is that the past and present activities in the headwaters

area of Grimes Creek did not result in exceedance of any water quality beneficial use

except as to salmonid spawning resulting from stream temperature. (CU045948, 046019-

**MEMORANDUM DECISION AND ORDER -** 31

20.) These materials are important in considering surface water and contamination issues. However, they do not address the potential impacts of the exploratory drilling on the groundwater in the area nor do they address the concern that the drilling may have in terms of changing the hydrology of the groundwater. *See Sierra Club*, 346 F.3d at 961.

During the Administrative Appeal the concerns over groundwater and surface water resources were raised in several of the issues on appeal. (CU050759) (noting the issues were raised in Appeal Issues 1, 2, 8, 16, and 19.) In particular, the issue concerning the failure to conduct a baseline groundwater study was raised. (CU050750.) In response, the Appeal Deciding Officer ("Deciding Officer") points to the EA's cumulative effects discussion of water quality (CU045868-69) and states that no additional groundwater studies were warranted. (CU050751.) Essentially concluding that because the effects of past and present activities have not resulted in exceedance of any surface water quality beneficial use, it is reasonable to conclude that no contaminates from the adjacent mines are apparent in the water downstream and no further groundwater studies are needed. Later, on Appeal Issue 16, the Deciding Officer similarly stated "[n]o baseline groundwater studies were conducted because there are no expected impacts to ground water for exploration."[8]

---

[8] Administrative Appeal Decision's response to Appeal Issue 16: "No baseline groundwater studies were conducted because there are no expected impacts to groundwater for exploration (DN/FONSI, Att. B, p. 63). "Because no groundwater impacts are expected as a result of this proposed exploration, no groundwater studies have been conducted. The existing hydrogeologic conditions in the area have been determined based on hydrologic (i.e. surface water) flow and topography. Using those principles (e.g. that groundwater flow mimics topography and hydrology), groundwater in the Grimes Creek drainage flows toward Grimes Creek and then subparallel to the creek (as it nears the creek),

Attachment B to the DN/FONSI contains the Response to Comments Received

During the 30-Day Notice and Comment Period. (CU046257.) Concern Statement

3100.10 discussed the water used in the drilling process and generally stated "[t]here

needs to be more analysis regarding groundwater – surface water interactions in the area."

(CU046319.) In response, the Forest Service stated that "because no groundwater impacts

are expected as a result of this proposed exploration, no groundwater studies have been

conducted. The existing hydrogeologic conditions in the area have been determined based

on hydrologic (i.e. surface water) flow and topography. Using those principles (e.g. that

ground water flow mimics topography and hydrology), groundwater in the Grimes Creek

drainage flows toward Grimes Creek and then subparallel to the creek (as it nears the

creek), ultimately contributing to the volume of flow in the Boise River drainage.

(CU046319.)[9]

However, as pointed out in Ms. Didricksen's Declaration, drilling exploratory

boreholes can impact the local groundwater conditions by altering groundwater flow and

drilling fluid and water leakage during borehole drilling. Ms. Didricksen opines that the

Forest service should have conducted a baseline hydrogeologic study to examine the

existing density and extent of bedrock fractures, the hydraulic conductivity of the local

---

ultimately contributing to the volume of flow in the Boise River drainage, not the Payette River
drainage." (DN/FONSI, Attachment B, p. 63)." (CU050755.)

[9] Mosquito Mining cites to this portion of the record in support of its argument that the Forest
Service analyzed the impacts to surface and groundwater quality. (Dkt. 51 at 10.) The Court has reviewed
this portion of the record and finds the response comment does not "analyze" the concern as much as it
states conclusions about the groundwater flow without any authority. (CU046319.)

geologic formations, and measured the local groundwater levels to estimate groundwater flow directions before making a determination of no impact. (Dkt. 23-4.) This draws into question the reasonableness of the Forest Service's determination of no significant impact having been made without any baseline and/or study of the groundwater.

Even without Ms. Didricksen's Declaration, the Court would conclude the Forest Service acted arbitrarily and capriciously in reaching its finding of no impact as to groundwater. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *MotorVehicle Mfrs. Ass'n*, 463 U.S. at 43. An EA is arbitrary and capricious if it fails to consider an important aspect of the problem, or "offer[s] an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. United States Envtl. Prot. Agency*, 346 F.3d 955, 961 (9th Cir. 2003).

The Forest Service did not study the groundwater hydrology of the area but, instead, rested its finding of no significant impact on the finding that surface water quality levels have not fallen below certain levels as a result of past and present mining activities and the assumption that the closed system drilling methods would eliminate any further contamination to the water. Those assumptions, however, are arbitrary and capricious.

**MEMORANDUM DECISION AND ORDER -**  34

The very nature of drilling holes 1,500 to 3,000 feet into the ground seems likely to impact the underlying surface including the groundwater. The appropriate course would be for the Forest Service to have conducted some baseline study and analysis of the groundwater in the area in order to reach the finding of no significant impact. The Forest Service's assurances that the closed system alleviates any concerns over impact to the groundwater may be enough as to the contamination concern if there were some baseline established and a system for monitoring. In this case, however, there is no monitoring mechanism in place for groundwater nor any mitigation measures in place to respond to possible impacts as have been put in place for other environmental considerations such as impacts to sensitive species. (CU045982.) [10]

Further, pointing to the use of closed drilling methods to answer the concerns regarding groundwater is arbitrary and capricious as it inappropriately relies upon mitigation measures to satisfy NEPA's obligations. *See Northern Plains Resource v. Surface Transp. Bd.*, 668 F.3d 1067, 1084 (9th Cir. 2011) (holding mitigation measures are not alone sufficient to meet NEPA's obligations to determine the projected extent of the environmental harm to resources before a project is approved.). While the assurances regarding closed drilling may ultimately be the appropriate way to address the concerns regarding contamination to the groundwater, it does not  address concerns regarding the

---

[10] Arguably the Project's use of a closed system drilling method, stability and sealing of the drill holes, the use of non-toxic drilling fluids, and employment of BMPS are all appropriate precautions to groundwater contamination issues. However, there still does not appear to be any monitoring anticipated nor any baseline established upon which to conduct any monitoring of the groundwater.

**MEMORANDUM DECISION AND ORDER -**  35

lack of baseline data, analysis, and monitoring of groundwater. These are significant environmental concerns which demand at least baseline analysis and/or at least some monitoring mechanism to give some assurance to the assumptions regarding the closed drilling methods before a finding of no significant impact can be made. *See Northern Plains*, 668 F.3d at 1083 ("Once a project begins, the pre-project environment becomes a thing of the past and evaluation of the project's effect becomes simply impossible.") (citation and marks omitted). In sum, the Court concludes that more is required under NEPA in order for the Forest Service to conclude that no significant impacts will result from the Project. As such, the Court will grant the Plaintiffs' Motion for Summary Judgment in this respect.

### vi)    Conclusion

As to the question of whether an EIS should have been prepared, the Court finds in favor of the Forest Service and Mosquito Mining on all but the concerns regarding groundwater. In that regard, the Court finds in favor of the Plaintiffs and concludes the Forest Service acted arbitrarily and capriciously in concluding that the Project does not significantly affect the groundwater in the Project area and have failed to supply a convincing statement of reasons or taken the requisite "hard look" at the potential environmental impacts of the Project on the groundwater and hydrology of the area. *See Blue Mts.*, 161 F.3d at 1212 ("If an agency decides not to prepare an [environmental impact statement], it must supply a convincing statement of reasons to explain why a Project's impacts are insignificant. The statement of reasons is crucial to determining

**MEMORANDUM DECISION AND ORDER -**  36

whether the agency took a hard took at the potential environmental impact of a Project.")
(citing 42 U.S.C. § 4332(2)(C)).

The conclusion reached in the DN/FONSI and EA that the Project does not
significantly affect the groundwater environment is based primarily on the assumption
that closed drilling practices will prevent any contamination to the groundwater. The
Forest Service acted arbitrarily and capriciously in concluding that no other impacts to
groundwater hydrology need be considered; such as with groundwater hydrology. *See
Marsh*, 490 U.S. at 376–377 (An agency's decision not to prepare an environmental
impact statement is reviewed under the arbitrary and capricious standard.). As such, the
Court will grant the Plaintiffs' Motion for Summary Judgment in this regard.

In doing so, the Court is mindful of the fact that the agencies are afforded
substantial deference. *See Kettle Range*, 148 F.Supp.2d at 1107. The Court's decision
here does not infringe on the discretion of the Forest Service but, instead, finds fault in
the lack of evidence considered by and/or analyzed in reaching its conclusions on the
CuMo Project as they relate to the impacts the drilling may have on the groundwater. The
Court will vacate that portion of the EA as to the finding of no significant impact as it
concerns groundwater and remand the matter to the Forest Service to undertake further
analysis concerning groundwater and determine whether to issue a supplemental EA or if
a full EIS is required.

    **B.**    **Violation of NFMA/Forest Plan**

        **1.**    **Subject Matter Jurisdiction**

**MEMORANDUM DECISION AND ORDER -**  37

Mosquito Mining has raised a suggestion of lack of subject matter jurisdiction arguing the Plaintiffs' NFMA claim should be dismissed because it is not yet ripe and/or moot. (Dkt. 30.) The basis for the motion is Mosquito Mining's argument that because the Forest Service has not yet authorized any incursions into the Riparian Conservation Areas ("RCAs") there is no NFMA claim. Plaintiffs argue the EA and DN/FONSI authorize incursions into an RCA and, regardless, maintain its NFMA claim is ripe. (Dkt. 45 at 27-28.)

"Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *See National Park Hospitality Ass'n v. Dept. of Interior*, 538 U.S. 803, 808 (2003) (citation omitted). In resolving ripeness challenges, the Supreme Court considers "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). Before the Supreme Court in *Ohio Forestry* was a NFMA challenge to the Forest Service's forest plan for the Wayne Nation Forest located in southern Ohio. *Id.* There the Supreme Court determined that although the forest plan set logging goals, selected areas of the forest suitable for timber production, and articulated likely methods of appropriate timber harvest, it did not itself authorize the cutting of any trees and the plaintiffs failed to argue the plan caused any injury. *Id.* at 729. As such, the Supreme

**MEMORANDUM DECISION AND ORDER -**  38

Court determined the suit was not yet ripe for court review.

In this case, Plaintiffs maintain that the Forest Service has authorized activities such as locating roads, stream crossings, drill pads, mud pits and other structures and facilities within RCAs at the CuMo site. (Dkt. 45 at 28.) Furthermore, Plaintiffs point out that the Forest Service is not obligated to involve the public in approving any PoO for the CuMo Project and, as such, it has no remedy at that stage. (Dkt. 45 at 30.) The Forest Service disputes that it authorized building roads or drill pads in the RCAs. The Forest Service states that no one knows where facilities will need to be placed until some drilling is done and, for that reason, its decision contemplates that facilities will be placed outside of RCAs unless no alternative exists but that the decision analyzed the possibility that some facilities would be located within RCAs. (Dkt. 49 at 12.) The Forest Service does note that water pumps necessarily will be placed in the RCAs but it is debatable whether the pumps are structures or facilities. (Dkt. 49 at 11 n. 3.)

The Court finds the NFMA claim is properly before it. The DN/FONSI is a final agency action. Whether the Forest Service complied with NFMA in its actions concerning the CuMo Project is ripe as the issues raised are fit for judicial decision and withholding the Court's consideration of the issue would only serve to cause hardship to the parties. *See Nat'l Park supra*. The DN/FONSI and EA do authorize activities to begin within the Project area. Although the Forest Service has required approval of PoO's before certain other building/activities can occur, delaying ruling on the challenges raised here would prejudice the Plaintiffs because they do not have the same ability to comment and/or

participate in the decision of whether any PoO's are approved. As such, further factual development would not significantly advance the Court's ability to deal with the legal issues presented to it. *See San Luis & Delta-Mendoza Water Auth. v. Salazar*, 638 F.3d 1163, 1174 (9th Cir. 2011) (quoting *Nat'l Park supra*).

Further, in *Ohio Forestry*, the plaintiffs were alleging substantive statutory violations. Such a substantive claim is different from a case where the allegation is that a procedural violation has occurred. *See Kern v. United States Bureau of Land Mgmt*. 284 F.3d 1062, 1071 (9th Cir. 2002). The question before the Court in this case on the NFMA claim has to do with whether or not the Forest Service acted in violation of NFMA's requirements in issuing the EA and DN/FONSI. Stated differently, is the Forest Service's approval of the CuMo Project inconsistent with the Forest Plan for the Boise National Forest. This is a procedural question properly before the Court for its determination.

### 2.    NFMA Claim

The Complaint asserts the Forest Service violated NFMA by authorizing the CuMo Project to construct roads, drill pads, and settling ponds in RCAs inconsistent to the Boise Forest Plan standards MIST08 and MIST09. (Dkt. 2.) Stated differently, Plaintiffs argue "the Forest Service has violated NFMA by locating roads, drill pads, and mud pits in [RCAs] without first determining that no alternatives exist and without minimizing road construction in RCAs, as required by the Boise Forest Plan." (Dkt. 23 at 17.) The Forest Service counters that because the Project is exploratory in nature, it cannot know at this time if it will be necessary to locate roads and pads in RCAs. (Dkt. 28

at 14.) Mitigation requirements were added, the Forest Service points out, in the event there is no alternative to avoiding activities in all RCAs. Mosquito Mining maintains the DN/FONSI and EA do not authorize any incursions into the RCAs but, instead, mandate further PoO approval for any such incursion as well as listed restrictions. (Dkt. 32 at 6.)

"NFMA requires the Forest Service to develop comprehensive management plans for each unit of the National Forest System, 16 U.S.C. § 1604(a), and all subsequent agency action must be consistent with the governing forest plan § 1604(i)." *Greater Yellowstone*, 628 F.3d at 1149; *see also Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) (citing 16 U.S.C. §§ 1604(a) and (i))).

> The NFMA sets forth the statutory framework and specifies the procedural and substantive requirements under which the Forest Service is to manage National Forest System lands. Procedurally, the NFMA requires the Forest Service to develop a forest plan for each unit of the National Forest System. 16 U.S.C. § 1604(a). In developing and maintaining each plan, the Forest Service is required to use "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." *Id.* § 1604(b). After a forest plan is developed, all subsequent agency action, including site-specific plans ... must comply with the NFMA and be consistent with the governing forest plan. *Id.* § 1604(i).

*Id.* (quoting *McNair*, 537 F.3d at 988-89). The claims raising violations of NFMA are also brought pursuant to the APA and governed by the "arbitrary and capricious" standard. *See* 5 U.S.C. § 706.

At issue here are two standards for managing mineral resources contained in the Boise Forest Plan; namely MIST08 and MIST09 which provide:

> MIST08:  Locate new structures, support facilities, and roads outside RCAs. Where no alternative to siting facilities in RCAs exists, locate and

construct the facilities in ways that avoid or minimize degrading effects to RCAs and streams, and adverse effects to TEPC species. Where no alternative to road construction in RCAs exists, keep roads to the minimum necessary for the approved mineral activity. Close, obliterate, and revegetate such roads if no longer required for mineral or other management activities.

MIST09:  "Prohibit solid and sanitary waste facilities in RCAs. If no alternative to locating mine waste (waste rock, spent ore, tailings) facilities in RCAs exists, then:
a) Analyze waste material using the best conventional methods and analytic techniques to determine its chemical and physical stability characteristics.

b) Locate and design waste facilities using the best conventional geochemical and geotechnical predictive tools to ensure mass stability and prevent the release of acid or toxic materials. If the best conventional technology is not sufficient to prevent such releases and ensure stability over the long term, and such releases or instability would result in exceedance of established water quality standards or would degrade surface resources, prohibit such facilities in RCAs.

c) Monitor waste and waste facilities to confirm predictions of chemical and physical stability, and make adjustments to operations as needed to avoid degrading effects to beneficial uses and native and desired non-native fish and their habitats.

d) Reclaim and monitor waste facilities to ensure chemical and physical stability and revegetation to avoid degrading effects to beneficial uses and native and desired non-native fish and their habitats.

e) Require reclamation bonds adequate to ensure long-term chemical and physical stability and successful revegetation of mine waste facilities.

CU003888-89.

As to MIST08, the Forest Service maintains it considered alternatives to locating any activities in RCAs and that it has instituted the Project consistent with the Forest Plan. (Dkt. 28 at 15-17.) As to MIST09, the Forest Service states the Project is consistent

**MEMORANDUM DECISION AND ORDER -**   42

with its requirements for solid and sanitary waste facilities, the mud pits, as they do not

contain any such waste that would result in the release of acid or other toxic material.

(Dkt. 28 at 17.) Again, the Forest Service points out that the drilling fluids are non-toxic

and biodegradable, the drill fluids will be contained in the drill pads, the drill holes will

be plugged and sealed, reclamation is required following completion, and a bond is

required before the PoO is approved. (Dkt. 28 at 17-18.) Where there is no alternative to

activities occurring on RCAs, the Forest Service cites to its mitigation, monitoring

measures, and BMPs put in place consistent with the Forest Plan. (Dkt. 28 at 18-19.)

    The Court finds the Forest Service's analysis and decision in the EA and

DN/FONSI are not arbitrary and capricious and in accord with NFMA's requirements. In

approving the CuMo Project, the Forest Service properly considered both MIST08 and

MIST09. In the DN/FONSI, the Forest Service noted its limited authority to influence

activities where, as here, they are submitted under the 1872 Mining Law; it "is limited in

that it may not deny Mosquito Gold's Plan of Operations, provided that the activities

proposed are reasonably incident to mining, not needlessly destructive, and otherwise

comply with applicable state and federal law." (CU046241.) The same is stated in the EA.

(CU045811, 45814.) The Forest Service determined the CuMo Project is consistent with

the Forest Plan. (CU045812-45814.) In considering mitigation efforts to aquatics, the EA

states that within RCAs the Project would

> -   "implement BMPs to ensure that sediment generated by drilling
>     activities would be minimized and liquids used during drilling would
>     be properly stored and distributed"

**MEMORANDUM DECISION AND ORDER -**  43

- there would not be any stored fuels and other toxicant or refueling within RCAs unless there are no other alternatives
- Storage of fuels and other toxicant or refueling sites within RCAs shall be approved by the responsible official and have an approved SPCC commensurate with the amount of fuel.

(CU045832-33.)

In the Administrative Appeal, the Deciding Officer also addressed whether the CuMo Project was consistent with MIST08 and MIST09. (CU050748-50.) The Deciding Officer noted that the Forest Service considered alternatives to placing roads and structures in RCAs where possible and where encroaching on an RCA was unavoidable the Forest Service identified ways to minimize effects by using mitigation and monitoring measures. (CU050748.) Likewise, the Deciding Officer determined the Project is consistent with MIST09's requirements. (CU050749.) The Court agrees with these assessments.

Based on the foregoing and upon its own review of the Administrative Record, the Court concludes that the CuMo Project is consistent with the Forest Plan and, in particular, with MIST08 and MIST09. The Forest Service properly evaluated the Forest Plan as required by NFMA and set forth a plan for approving any encroachments into an RCA that is unavoidable and the monitoring and mitigation efforts to be used in such a case. The Defendants' Motions for Summary Judgment as to the NFMA claim are granted and Plaintiffs' Motion for Summary Judgment as to the NFMA claim is denied.

# ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1) Plaintiffs' Motion for Summary Judgment (Dkt. 23) is **GRANTED IN PART AND DENIED IN PART**.

2) Defendant's Motion for Summary Judgment (Dkt. 27) is **GRANTED IN PART AND DENIED IN PART**.

3) Intervener-Defendant's Motion for Summary Judgment as to NEPA Claim (Dkt. 29) is **GRANTED IN PART AND DENIED IN PART**.

4) Intervener-Defendant's Motion for Summary Judgment as to NFMA Claim (Dkt. 30) is **GRANTED**.

5) Defendant's Motion to Strike (Dkt. 24) is **GRANTED IN PART AND DENIED IN PART**.

6) Intervener-Defendant's Motion to Amend/Correct Administrative Record (Dkt. 26) is **DENIED**.

7) Intervener-Defendant's Motion to Strike Letter (Dkt. 48) is **GRANTED**.

IT IS FURTHER ORDERED that the Defendant Forest Service's decisions regarding groundwater made in the Environmental Assessment are **VACATED** and the matter is **REMANDED** to the Forest Service for further proceedings consistent with this opinion and this case is hereby closed.

DATED:  **August 29, 2012**

~~Honora~~ble Edward J. Lodge
U. S. District Judge